**AFFIDAVIT OF SPECIAL AGENT ANTHONY P. RUSSO, JR.,**
**IN SUPPORT OF AN APPLICATION FOR A CRIMINAL COMPLAINT**

Special Agent Anthony P. Russo, Jr., being duly sworn, deposes and states as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a duly appointed Special Agent (SA) with the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), formerly known as the United States Customs Service (USCS) and the Immigration and Naturalization Service (INS), currently assigned to the Office of the Special Agent in Charge (SAC), Document and Benefit Fraud Task Force (DBFTF), Boston, Massachusetts (MA). I am authorized to investigate crimes involving violations of Title 18, Title 8, Title 19, and Title 21 of the United States Code (USC).

2. I have been employed as a HSI Special Agent since May 2009. I am a graduate of the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia, where I received training to become a federal agent; specifically, I received certification in the Criminal Investigator Training Program and the ICE Special Agent Training Program. I received training relating to Document and

Benefit Fraud, including the use of stolen identities of United States Citizens; immigration offenses; and crimes involving corruption. Prior to becoming a HSI Special Agent, your affiant was a police officer in the Commonwealth of Massachusetts for approximately eight (8) years and in the State of Maine for approximately three (3) years.

3. I have participated in investigations of document fraud, benefit fraud, marriage fraud, aggravated identity theft, false claims to United States Citizenship, border violations, and corruption. Many of these investigations have had national and international connections and many required me to work closely, and to share information and intelligence with, members of other law enforcement agencies, including the Department of State – Diplomatic Security Service (DOS-DSS), the Department of Labor – Office of the Inspector General (DOL-OIG), the Massachusetts State Police (MSP), the police departments of local communities including Boston, and the United States Attorney's Office for the District of Massachusetts and the Southern District of New York. I have debriefed, and continue to debrief, defendants, informants, and witnesses who have personal knowledge about document and benefit

fraud, including aggravated identity theft, and other crimes occurring in Massachusetts, nationally, and abroad.

4. I am currently investigating Evelyn MEDINA ("MEDINA"), Annette GRACIA ("GRACIA"), Kimberly C. Jordan ("JORDAN"), and David Brimage, a/k/a David Brimage, Jr. ("BRIMAGE") for Aggravated Identity Theft in violation of 18 U.S.C § 1028A.

5. This affidavit is being submitted in support of applications for criminal complaints charging MEDINA, GRACIA, JORDAN, and BRIMAGE, with Aggravated Identity Theft in connection with a scheme to knowingly and willfully produce false identification documents without lawful authority. This affidavit is based upon my own investigation and information provided to me by other law enforcement agents and agencies. This affidavit is not intended to contain all the information I have learned during the course of this investigation, but that which is sufficient to support a finding of probable cause in support of applications for criminal complaints charging MEDINA, GRACIA, JORDAN, and BRIMAGE with a violation of 18 U.S.C. § 1028A, Aggravated Identity Theft.

## BASIS FOR INFORMATION

6. The affidavit comes from my personal observations; oral and written reports from other agents and witnesses; discussions that I have personally had with other investigators; physical surveillance conducted by Special Agents of HSI, MSP Detectives, and other members of law enforcement, the results of which have been reported to me personally; review of public records; my training and experience; and statements of confidential informants and cooperating defendants as described below.

7. I have relied on information from a HSI numbered Confidential Informant ("HSI CI"). I know the HSI CI's name and have spoken and worked with the HSI CI for approximately 8 years. The HSI CI has no prior convictions. The HSI CI is cooperating for monetary gain and its interest in assisting law enforcement. HSI also assisted the HSI CI in obtaining certain federal benefits. The HSI CI has received no subsistence payments for its cooperation in this investigation. However, the HSI CI has received monetary compensation in the past for other investigations. The HSI CI has participated in operations resulting in the seizure of evidence and criminal convictions. Your affiant has found the HSI CI to be reliable because its cooperation

has resulted in the seizure of evidence and recorded conversations and has resulted in numerous convictions.

8. I have also relied on information from a HSI Cooperating Defendant ("HSI CD"). I know the HSI CD's name and have spoken and worked with the HSI CD during this case. The HSI CD has convictions for narcotics violations that are approximately 10 years old. The HSI CD has received no subsistence payments for its cooperation in this investigation. The HSI CD has participated in operations resulting in the seizure of evidence. Your affiant has found the HSI CD to be reliable because its cooperation has resulted in the seizure of evidence and recorded conversations.

9. Because this affidavit is intended to show merely that there is sufficient probable cause for the requested criminal complaints, it does not set forth all of my knowledge about this matter. Rather, I have set forth only the facts that I believe are necessary to establish the necessary foundation for the requested complaint.

## MEDINA'S FRAUDULENT DOCUMENT OPERATION

10. On October 5, 2015, your affiant received information from an HSI Special Agent, regarding an anonymous letter sent to the Massachusetts State Police –

Compliance Enforcement Unit (MSP-CEU) alleging corruption of a Registry of Motor Vehicles (RMV) employee. The anonymous letter stated, "An employee by the name Evelyn MEDINA" was using her job (at the RMV) to provide personal information to people within her community.  A MSP-CEU Detective provided the following biographical information for the employee: Evelyn MEDINA DOB: XX/XX/1961, SSN: XXX-XX-2089; MA OLN: SXXXXX342. HSI indices checks revealed the following: Evelyn MEDINA, DOB: XX/XX/1961, a national of the Dominican Republic and a Citizen of the United States.

11. In 2016, pursuant to an official request, a MSP-CEU Detective provided information on MEDINA's RMV work product at the Haymarket branch of the RMV. During the week of June 1-5, 2015 there were 79 instances of Social Security number queries with no transaction activity associated with them. During the week of June 8-12, 2015, there were 80 instances of SSN queries with no transaction activity associated with them. During the month of February 2016, there were 208 instances of SSN queries with no transaction activity associated with them. Of the 208 queries, 13 people are deceased and 9 are duplicates. A MSP-CEU Detective indicated this amount of queries is abnormal and not consistent with the average number of queries made by RMV clerks.

12. In 2016, the HSI CI made a consensually monitored and recorded telephone call to a document vendor. The HSI CI asked the document vendor if it could help the HSI CI since the HSI CI was previously deported from the United States. The document vendor explained it would get the HSI CI "the paper"[1] (fraudulent documents of the stolen identifications of United States Citizens) first, then "the ID" (Massachusetts (MA) Identification (ID) Card). The HSI CD asked the document vendor if it had someone in there (working at the RMV). The document vendor stated, "Yes for the ID" but not "for the permit". The document vendor again stated, "Yes, I do have someone in the inside, yes for the ID, of course". The document vendor told the HSI CI if the papers are not good, they will not take a picture of you. The document vendor told the HSI CI it would cost it $2,500 United States Dollars (USD) total (for the fraudulent paperwork and the MA ID). The document vendor explained to the HSI CI it would have to pay $500 USD up front. Once the papers were received, the document vendor stated, "We don't know if they're good until I take you to the girl [at the RMV]". The document vendor stated after it took the HSI CI to "the girl" (RMV clerk) and the HSI CI received the MA

---

[1] Through my training and experience, it is known to me that documents of the stolen identities of United States Citizens are routinely referred to as "Papers".

ID, the HSI CD would pay the balance of the $2,500 USD to the document vendor.[2]

13. In 2016, a consensually monitored and recorded under cover (UC) meeting was conducted between the HSI CI, the document vendor, and MEDINA. During the UC meeting, the document vendor took the HSI CI to Boston's City Hall and assisted the HSI CI with registering to vote utilizing the counterfeit documents of the stolen United States Citizen identity. The document vendor and the HSI CI walked to the Haymarket RMV branch. The document vendor introduced the HSI CI to a Hispanic male who identified himself as "Miguel" LNU[3] (hereinafter referred to as Miguel). Miguel told the HSI CI he was previously deported for selling 1.5 kilograms of cocaine and reentered the United States (U.S.) utilizing fraudulent Puerto Rico papers. Miguel and the HSI CI entered the Haymarket RMV where Miguel took an automatically generated customer number (B138) and filled out the RMV ID application for the HSI CI. The HSI CI's number was called (B138) directing it to counter #17. Miguel redirected the HSI CI to counter #25, which was MEDINA's counter. Miguel accompanied the HSI CI to the counter. At the counter, the HSI CI presented a Puerto Rico

---

[2] Through other investigative means, your affiant has learned, MEDINA was paid $500 USD for this transaction.
[3] Miguel LNU has since been identified by your affiant, but will not be named here due to the ongoing investigation.

birth certificate and Social Security Card in the name of XXXXXX XXXXX-RIVERA, DOB: XX/XX/1966 to MEDINA. MEDINA had the HSI CI sign its name and then took the HSI CI's photograph. MEDINA asked the HSI CI several questions regarding its biographical information that the HSI CI could not answer. MEDINA left her work station with the documents. Miguel stated, "There's the exit" to the HSI CI. The HSI CI exited the Haymarket RMV followed by Miguel. Outside the Haymarket branch the document vendor became angry at the HSI CI stating it could have gotten everyone in trouble. Due to this event, the document vendor raised the price of the overall transaction. The document vendor stated it would still be able to get the MA ID for the HSI CI. The document vendor charged the HSI CI $300 USD for "checking" the XXXXX-RIVERA identity to ensure it belonged to a real person[4] and that there were no issues with the identity (i.e. warrants, etc.)[5]. The document vendor then entered the Haymarket RMV. Your affiant reviewed RMV Closed Caption TV (CCTV) footage from the date and time of this UC meeting and observed the document vendor walk up to

---

[4] Through other investigative means, your affiant has learned, MEDINA was paid $300 USD for this transaction.

[5] Based on training and experience, your affiant knows individuals involved with providing counterfeit documents will often charge a fee to "check" the identification before it is presented to a RMV clerk to ensure the ID or driver's license will be issued. The RMV clerk will enter the Social Security Number (SSN) into the RMV database without creating a transaction checking the ID beforehand to see if there is already an ID or DL issued in the system, to ensure there are no warrants or child support payments in the system that would prevent the ID and/or DL from being issued.

MEDINA's counter for an extended period of time. The document vendor handed MEDINA what appeared to be a Social Security Card which MEDINA put with the rest of the XXXXX-RIVERA paperwork that was handed to her earlier. MEDINA walked off, then returned and handed the document vendor several pieces of paper that the document vendor folded up and took with it. MEDINA put on her coat and both the document vendor and MEDINA walked away. A review of RMV CCTV showed the document vendor coming down the stairs from the RMV at the same exact time that MEDINA exited the elevator. However, the two did not make eye contact or acknowledge each other. The document vendor and MEDINA walked out of the RMV. Your affiant observed MEDINA and the document vendor talking outside the RMV while MEDINA smoked a cigarette.

14. In 2016, approximately four days after the above referenced UC meeting, the HSI CI conducted a consensually monitored and recorded UC meeting with the document vendor. During this UC meeting, the document vendor provided the HSI CI with a temporary MA ID card in the XXXXX-RIVERA identity but with the HSI CI's photograph. The HSI CI provided the document vendor with the remaining money owed in government provided funds.

15. In 2016, pursuant to an official request, Department of State – Diplomatic Security Service (DOS-DSS) provided a birth verification record from the Puerto Rico Demographic Registry in the name of XXXXX-RIVERA. DOS-DSS also provided a Puerto Rico Electoral Card with photograph and Puerto Rico Driver's License with photograph in the XXXXX-RIVERA identity.

16. In 2016, approximately 16 days after the above-mentioned UC meeting referenced in paragraph 13, the HSI CI conducted a consensually monitored and recorded UC meeting with the document vendor. During the UC meeting, the document vendor provided the HSI CI with a MA ID card (permanent plastic card), Puerto Rico birth certificate, and a Social Security Card all in the name of XXXXX-RIVERA.

17. A RMV records check was conducted by a MSP-CEU Detective that showed MEDINA issued the MA ID in the XXXXX-RIVERA identity exactly one day after the HSI CI entered the Haymarket Branch of the RMV and provided the XXXXX-RIVERA documents to MEDINA. The MSP-CEU Detective stated conducting a transaction in this manner is not a standard or acceptable practice for a RMV clerk.

18. In late 2016, pursuant to an official request, DOS-DSS conducted RMV records checks of three addresses associated with the document vendor. One is the document

11

vendor's address, the second is the document vendor's neighbor (across the hall of apartment building), and the third is the document vendor's mother. DOS-DSS was able to identify 23 MA ID's, driver's licenses (DL), and permit transactions associated with these addresses. Of the 23 transactions, MEDINA issued MA ID's, DL's, or Permits to 18 imposters using Puerto Rico identities[6]. In addition, MEDINA issued one ID card to a citizen and national of the Dominican Republic who was an illegal re-entry in the United States and removed one license out of suspension for another citizen and national of the Dominican Republic.

### GRACIA'S FRAUDULENT DOCUMENT OPERATION

19. In 2017, your affiant received information from the HSI CD regarding another corrupt clerk at the MA RMV Haymarket Branch named Annette GRACIA, DOB: XX/XX/1980, SSN: XXX-XX-7441, cellular telephone number (XXX) XXX-XX67.

20. In 2017, GRACIA inquired with the HSI CD if it had anyone that needed MA identification ("ID") cards because GRACIA was going out that weekend. The HSI CD understood this to mean GRACIA wanted money from the fraudulent RMV transaction before the weekend. The HSI CD conducted a

---

[6] Through training and experience, your affiant knows that individuals frequently utilize Puerto Rico Documents and/or Personally Identifiable Information stolen from United States Citizens due to the fact United States Citizens from Puerto Rico are of Hispanic descent.

consensually monitored and recorded UC telephone call to
GRACIA. The HSI CD told GRACIA it would have two people
(illegal aliens) for her. GRACIA asked, "What are they
doing the ID or the license?" The HSI CD stated it was the
license. GRACIA asked "do they have" a "good document" to
which the CD responded "same thing they normally have, the
birth certificate, the social security [card] and the
license and the record." GRACIA responded "ok fine, let's
see how that works[s]." The HSI CD stated "just how you
done it before" and "same thing you already know" to which
GRACIA said "yeah".

21. In 2017, a consensually monitored and recorded UC
meeting was conducted between the HSI CD and RMV Clerk
GRACIA. The morning of the UC meeting, the HSI CD conducted
a consensually monitored and recorded UC telephone call to
GRACIA. GRACIA told the HSI CD she is at work. The HSI CD
told GRACIA, "I'm bringing a guy there today, you hear?"
GRACIA asked what time and the HSI CD and GRACIA determined
a time to meet at the RMV after GRACIA's lunch. GRACIA
asked the HSI CD, "What are we doing today?" The HSI CD
responded, ". . . A guy. . . . there's a guy that's going
to apply for an ID, you know, but I don't know if his
papers are good, you know because they're from Puerto Rico,
but I don't know if they're good". GRACIA replied, "I

know". The HSI CD stated, "But you know how to check;
you're the only one who knows . . . if they are bad."
GRACIA asked, "He's the only one right?" The HSI CD
replied, "He's one of them, yes, today. That's the one I'm
bringing". GRACIA responded, "Okay, and did he show you the
ID or the license?" (Agent's Note: The HSI CD stated it
understood this to mean does the "guy" need an ID or
license.) The HSI CD stated, "No, the ID . . . the ID".
GRACIA replied, "The ID, okay".

22. Prior to the UC meeting, arrangements were made
with the unidentified Hispanic male ("UHM") who needed the
fraudulent identification to meet the HSI CD outside the
Haymarket branch of the RMV. The HSI CD brought the UHM
into the Haymarket branch. The HSI CD conducted a
consensually monitored and recorded telephone call to tell
GRACIA it had arrived at the RMV. Your affiant observed
GRACIA exit the back (non-public) room and walk over to the
HSI CD and the UHM. The HSI CD greeted GRACIA and then
pointed at the UHM and says, "That's the guy for the paper;
make sure the paper is good". GRACIA stated, "Okay, I will.
I know". The HSI CD, GRACIA, and the UHM walked toward
counter #6 together. At the counter, the UHM gave GRACIA a
Puerto Rico birth certificate, Social Security Card, and
RMV driver's license/identification application in the

stolen United States citizen identity of XXXXXX XXXXXX-
MENDEZ. The HSI CD told GRACIA to make sure the papers were
good. GRACIA stated, "Okay what does he (UHM) want?" The
HSI CD stated, "ID". GRACIA replies, "Okay". GRACIA had the
UHM sign his name and then GRACIA took the UHM's
photograph. GRACIA gave the documents back to the UHM and
GRACIA collected $25.00 USD from the UHM for the RMV fee.
GRACIA gave the UHM a temporary, paper ID and told the UHM
the real ID would arrive in 5-10 days. The HSI CD told
GRACIA it would see her [later that day].

23. Later the same day, a second consensually
monitored and recorded UC meeting was conducted between the
HSI CD and GRACIA in Boston, MA. During the meeting, the
HSI CD told GRACIA "500 for you, 500 for me". GRACIA stated
"500? Good!" The HSI CD handed GRACIA $500 USD in
government provided funds and stated, "you get 5 and I get
5". GRACIA counted the money and stated, "I am happy".

24. A detective from the MSP-CEU provided a copy of
the transaction record and photograph for the above
mentioned UC meeting showing the ID was issued by GRACIA.

25. Approximately 13 days later, pursuant to an
official request, DOS-DSS provided birth verification from
the Puerto Rico Demographic Registry for XXXXXX XXXXXX-
MENDEZ, DOB: XX/XX/XX87, SSN: XXX-XX-9556 as well as a

Puerto Rico DL and photograph. The photograph associated with the Puerto Rico DL and Electoral card do not resemble the UHM associated with the MA ID issued by GRACIA.

### JORDAN'S FRAUDULENT DOCUMENT OPERATION

26. In early 2017, your affiant, along with other members of law enforcement, conducted an interview of the HSI CD. The HSI CD stated a black female, who the HSI CD called, "Shakia" (later identified as Kimberly C. JORDAN, DOB: XX/XX/1984, hereinafter referred to as "JORDAN"), is employed as a clerk at the Haymarket Branch of the RMV. The HSI CD stated JORDAN has helped in the past with fraudulently issuing MA DLs and/or IDs to illegal aliens believed to be from the Dominican Republic. These illegal aliens are using fraudulently obtained identification documents utilizing the stolen identity of United States Citizens to obtain these DLs and/or ID's (See footnote 5). These identification documents include Puerto Rico birth certificates and U.S. Social Security cards. The HSI CD did not know "Shakia's real name but stated "Shakia" was introduced to the HSI CD by another corrupt Haymarket RMV clerk named Annette GRACIA (hereinafter referred to as "GRACIA"), who the HSI CD had personally paid money to in the past for fraudulently issuing MA DLs and/or ID cards.

27. Subsequently, your affiant[7] showed the HSI CD a photograph of the MA DL for Shakia XXXXXX and a photograph of JORDAN obtained through DOS indices.  The HSI CD immediately and definitively stated the photograph of JORDAN was the person the HSI CD knew as "Shakia". The CD signed and dated the back of the printed DL photograph of JORDAN and wrote this person is "Shekia" [sic].

28. In early 2017, the HSI CD provided information to your affiant regarding an unidentified Hispanic female who requested assistance in obtaining a MA ID for a Hispanic friend.  The unidentified, male Hispanic friend (Hereinafter referred to as "UHM-1") is believed to be an illegal alien from the Dominican Republic.  The HSI CD stated UHM-1 had counterfeit identification documents of the stolen identity of a United States Citizen to include a Puerto Rico birth certificate and U.S. Social Security card.  UHM-1 needed proof of residency to complete the MA ID application.

29.  In early 2017, your affiant, along with other members of law enforcement, conducted a consensually monitored and recorded UC meeting between the HSI CD, UHM-1, and JORDAN.  Prior to the UC meeting, the HSI CD spoke

---

[7] In 2017, your affiant, along with another HSI Special Agent, learned through surveillance and other investigative methods that the HSI CD had previously misidentified the suspected clerk the HSI CD believed to be "Shakia".

with GRACIA who stated JORDAN would issue the MA ID and
GRACIA would accept payment for the illegal transaction.
The HSI CD met with UHM-1 near City Hall in Boston, MA.
UHM-1 was in possession of a Puerto Rico birth certificate
and U.S. Social Security card in the identity of XXXXXXXX
Serrano, DOB: XX/XX/1990, SSN: XXX-XX-1664. The HSI CD
completed a voter registration application using the
Seranno identity documents obtained from UHM-1. UHM-1 was
then issued a certified voter registration card from the
City of Boston Election Department.

30. Shortly thereafter, the HSI CD and UHM-1 entered
the Haymarket branch of the RMV and met with JORDAN.  The
HSI CD filled out a MA RMV ID application form using the
counterfeit identity documents provided by UHM-1.  The HSI
CD and UHM-1 met with JORDAN who escorted them to a RMV
clerk counter.  The HSI CD told JORDAN to check the
"papers" [Serrano identification documents] because the guy
[UHM-1] was Dominican and the papers [birth certificate]
were Puerto Rican.  Subsequently, JORDAN issued a MA ID
card (temporary paper version) to UHM-1 in the name of
XXXXXXXX Serrano.

31. Immediately after, the HSI CD texted (consensually
monitored and recorded) GRACIA who also was working at the
RMV Haymarket branch to arrange payment for the fraudulent

transaction.  The HSI CD and GRACIA met inside the RMV Haymarket branch wherein GRACIA accepted and counted $300 USD in U.S. Government provided funds from the HSI CD.

32. The next day, a MSP-CEU Detective provided your affiant with a copy of the MA RMV ID application for UHM-1 and accompanying RMV indices checks in the XXXXXXXX Serrano identity.  A review of these documents showed JORDAN's employee number listed as the RMV clerk issuing the MA ID card as well as requesting a system SSN verification and scanning the Serrano identity documents into the RMV database.

33. The MA RMV ID application included a copy of the fraudulently obtained identification documents provided by UHM-1 that JORDAN scanned into the RMV database.  In 2017, pursuant to an official request, DOS-DSS provided a Puerto Rico DL record of the true Serrano identity, DOB: XX/XX/1990, SSN: XXX-XX-1664. The Puerto Rico DL photograph does not resemble UHM-1.

34. In early 2017 after the above mentioned UC meeting, your affiant, along with another HSI Special Agent, showed the HSI CD a photograph of JORDAN obtained through DOS indices.  The HSI CD identified the female in the photograph as the person the HSI CD knew as "Shakia".The HSI CD signed and dated the back of the

photograph of JORDAN and wrote, this person gave me the ID
[card] on X XX, 2017.

35. In 2017 after the above mentioned UC meeting, the
HSI CD provided information to me regarding an unidentified
Hispanic male who needed to obtain a MA ID card for two
Hispanic males believed to be illegal aliens from the
Dominican Republic (hereinafter referred to as "UHM-2" and
"UHM-3"). The HSI CD stated UHM-2 and UHM-3 have
counterfeit identification documents of the stolen identity
of United States Citizens to include Puerto Rico birth
certificates, U.S. Social Security cards, and proofs of
residency.

36.  In early 2017, your affiant, along with other
members of law enforcement, conducted a consensually
monitored and recorded UC meeting between the HSI CD, UHM-
2, UHM-3, GRACIA, and JORDAN.  Previously, the HSI CD spoke
with GRACIA who stated GRACIA and JORDAN would each issue a
MA ID.   The HSI CD met UHM-2 and UHM-3 outside the
Haymarket branch of the RMV in Boston, MA.  The HSI CD,
UHM-2, and UHM-3 entered the Haymarket branch. The HSI CD
began filling out the RMV ID application for UHM-2.  The
HSI CD and UHM-2 were called over to the RMV clerk counter
by JORDAN.  JORDAN completed the RMV ID application and
attempted to issue the MA ID card to UHM-2.  JORDAN told

20

the HSI CD she was unable to issue the ID because the name (and related Social Security number) on UHM-2's identification documents were already in use according to the RMV database.  JORDAN turned the computer screen on the RMV computer so the HSI CD could see the photograph and related data under that name.

37. At JORDAN's counter, GRACIA approached the HSI CD and told the HSI CD she would take UHM-3 to her RMV clerk counter.  Once at the counter, GRACIA issued a MA ID to UHM-3.

38. Immediately after, the HSI CD texted (consensually monitored and recorded) GRACIA to come get the money.  GRACIA texted back indicating she would send someone (to pick up the money).  The HSI CD understood the text to mean GRACIA would send JORDAN to pick up the money.  The HSI CD and JORDAN met inside the RMV Haymarket branch wherein JORDAN accepted $300 USD from the HSI CD in U.S. Government provided funds for the illegal transaction.

39. JORDAN also ripped off a piece of paper from a blank RMV application, wrote her name and telephone number on it, and gave it to the HSI CD.  At the conclusion of the UC meeting, a HSI Special Agent seized a piece of paper bearing the name "Kim J" and telephone number XXX-XXX-5508.

40. A subpoena of T-Mobile telephone number: XXX-XXX-5508 showed the subscriber as Kimberly C. Jordan, DOB: XX/XX/1984.  The mailing address listed by T-Mobile for JORDAN matches DOS-DSS indices checks for JORDAN.

41. The day after the above mentioned UC meeting, a MSP-CEU Detective provided your affiant with a copy of the MA RMV ID application for UHM-3 and accompanying RMV indices checks in the stolen United States Citizen identity of XXXXXX XXXXX-Rosario, DOB: XX/XX/1987, SSN: XXX-XX-4268. The MSP-CEU Detective indicated RMV clerk GRACIA issued the MA ID.

42. The MA RMV ID application included a copy of the fraudulently obtained identification documents provided by UHM-3 that GRACIA scanned into the RMV database. These documents were a Puerto Rico birth certificate, U.S. Social Security card, and voter registration card issued by the City of Boston.  In 2017, pursuant to an official request, DOS-DSS provided a Puerto Rico DL record for the true XXXXX-Rosario identity, DOB: XX/XX/1987, SSN: XXX-XX-4268. The Puerto Rico DL photograph does not resemble UHM-3.

43. In Spring 2017, the HSI CD conducted several consensually monitored and recorded telephone calls and text messages with JORDAN.  The telephone number called and texted each time was XXX-XXX-5508.  During one call, the

HSI CD asked JORDAN if she was working the following week. The HSI CD informed JORDAN there were two people who needed IDs.  The HSI CD informed JORDAN the people were from the "Dominican" and had been "deported before".  JORDAN agreed to issue one MA ID and then agreed to ask RMV clerk David BRIMAGE (hereinafter referred to as "BRIMAGE") to issue the second fraudulent ID. (See "BRIMAGE's FRAUDULENT DOCUMENT OPERATION" below for additional information.)

44. On another occasion in Spring 2017, the HSI CD promised to pay JORDAN "five hundred" dollars to fraudulently issue a MA ID.  JORDAN, who on that day was not assigned to a clerk counter, told the HSI CD she would find another employee to cover her position, thereby allowing JORDAN to issue the MA ID card.

45. The same day as mentioned in the above paragraph, your affiant, along with other members of law enforcement, conducted a consensually monitored and recorded UC meeting with the HSI CD and two HSI Special Agents acting in an undercover capacity (hereinafter referred to as "UCA"). Prior to the meeting, the HSI CD received a consensually monitored and recorded text message from JORDAN directing the HSI CD to a specific RMV clerk counter where JORDAN was assigned. The HSI CD and UCAs, met with JORDAN and BRIMAGE inside the Haymarket branch of the RMV in Boston, MA.

23

JORDAN and BRIMAGE attempted to fraudulently issue a MA ID to the UCAs, but were unable to do so. The RMV computer system rejected the identification documents due to the dates of birth not matching.

46. At the conclusion of the UC meeting, the HSI CD received a consensually monitored and recorded telephone call from JORDAN.  The HSI CD told JORDAN it would get the documents fixed and then return the following week.  JORDAN stated "okay".  The HSI CD again promised to pay JORDAN $500 USD. JORDAN stated "okay".

## BRIMAGE'S FRAUDULENT DOCUMENT OPERATION

47. In early 2017, your affiant, along with other members of law enforcement, conducted an interview of the HSI CD.  The HSI CD stated a black male, who the HSI CD knows as "David," (later identified as David Brimage; hereinafter referred to as "BRIMAGE"), is employed as a clerk at the Haymarket branch of the RMV located in Boston, MA. BRIMAGE has knowingly issued fraudulent MA DLs and/or ID cards to illegal aliens, believed to be from the Dominican Republic, who are using counterfeit identification documents of the stolen identities of United States Citizens.  These identification documents include Puerto Rico birth certificates and U.S. Social Security

cards.  The HSI CD stated it personally brought at least
two illegal aliens to BRIMAGE in the past to fraudulently
issue MA DLs and/or IDs utilizing the stolen identities of
United States Citizens.  Your affiant showed a photograph
of BRIMAGE to the HSI CD. The HSI CD stated it knew this
person as "David."  The HSI CD provided the following
cellular telephone number for BRIMAGE:  XXX-XXX-9441.

48. In Spring 2017, your affiant, along with other
members of law enforcement, conducted a consensually
monitored and recorded UC meeting between the HSI CD, two
HSI UCAs, BRIMAGE, and JORDAN.  The HSI CD and UCAs, met
with BRIMAGE and JORDAN inside the Haymarket branch of the
RMV in Boston, MA.  The UCAs were both in possession of
counterfeit Puerto Rico birth certificates, U.S. Social
Security cards, and proofs of residency issued by the City
of Boston.  BRIMAGE and JORDAN attempted to fraudulently
issue a MA ID to the UCAs, but were unable to due to the
RMV computer system rejecting the identification documents
due to the dates of birth not matching. (See paragraph 44-
45.)

49. A short time after the conclusion of the UC
meeting, the HSI CD received a consensually monitored and
recorded cellular telephone call from JORDAN's telephone
number.  However the caller was a male party who identified

himself as "David" who the HSI CD knew to be BRIMAGE.
BRIMAGE told the HSI CD the "birth" was "not matching" in
the [RMV] "system."   BRIMAGE told the HSI CD the people
(referencing the HSI UCAs) "should've left something."   The
HSI CD asked BRIMAGE, "you want to get paid?" BRIMAGE
stated, "They don't have to leave the whole thing but at
least something because now it's in the system."   The HSI
CD asked, "You want me to give" you "two hundred dollars"?
BRIMAGE replied, "yeah, at least."   BRIMAGE told the HSI CD
he used his "computer" and did not want to do "nothing for
nothing."   BRIMAGE asked the HSI CD to pay the money to
JORDAN however the HSI CD refused telling BRIMAGE it would
pay him the money directly.   BRIMAGE agreed to meet the HSI
CD outside the Haymarket branch of the RMV later that day
during his lunch break.

    50.   On the same date, your affiant, along with other
members of law enforcement, conducted a consensually
monitored and recorded UC meeting between the HSI CD and
BRIMAGE outside the Haymarket branch of the RMV in Boston,
MA.   The HSI CD told BRIMAGE it would "fix" the documents
and bring the people back next week to which BRIMAGE
agreed.

    51. BRIMAGE asked the HSI CD about the people (illegal
aliens).   The HSI CD told BRIMAGE they are "Dominican

26

people" who use "Puerto Rico papers."  BRIMAGE told the HSI
CD he only wanted to do "one or two a week."  The HSI CD
understood this to mean BRIMAGE would only fraudulently
issue a MA ID once or twice per week.  BRIMAGE told the HSI
CD he would charge it $200 USD to "check" even if the
counterfeit documents were ". . . no good . . . ."  BRIMAGE
said this was "not the full price . . . ."  The HSI CD
understood it would pay the full price of $500 USD if the
ID was issued.

52. At the conclusion of the meeting, the HSI CD asked
BRIMAGE if he wanted the "2", ($200 USD) to which BRIMAGE
replied "yeah".  BRIMAGE accepted $200 USD from the HSI CD
in U.S. Government provided funds for the attempted illegal
transaction.

53. The next day a MSP-CEU Detective provided copies
of the MA RMV ID applications for the identities used by
the UCAs.  BRIMAGE's employee number is listed as the RMV
clerk attempting to issue the MA ID for one of the
fraudulent identities utilized by the UCA and conducting
corresponding actions, to include three requests of the RMV
computer system to verify the Social Security number,
scanning the counterfeit identity documents into the RMV
computer system, and taking a photograph of the UCA.

54.   In Spring 2017, your affiant, along with other members of law enforcement, conducted a second consensually monitored and recorded UC meeting between the HSI CD, a HSI UCA, and BRIMAGE.   Prior to the meeting, the HSI CD received a consensually monitored and recorded text message from BRIMAGE's cellular telephone number: XXX-XXX-9441. BRIMAGE asked the HSI CD, "What's up you here?"   The HSI CD and UCA met with BRIMAGE inside the Haymarket branch of the RMV in Boston, MA.   The UCA was in possession of a counterfeit Puerto Rico birth certificate, U.S. Social Security card, and proof of residency.   At his RMV clerk counter, BRIMAGE took the RMV ID application and entered the information from the fraudulent identification documents into the RMV computer system.   BRIMAGE then issued a MA ID (temporary paper version) to the UCA, whom he believed to be an illegal alien from the Dominican Republic.

55. Prior to the HSI CD and UCA leaving the clerk counter, BRIMAGE told the HSI CD to meet him at a location nearby the Haymarket branch.   Shortly thereafter, the HSI CD received a consensually monitored and recorded text message from BRIMAGE from the following cellular telephone number: XXX-XXX-9441 instructing the HSI CD to meet him at a specific intersection nearby.   Upon BRIMAGE's arrival he

spoke briefly with the HSI CD and then accepted $500 USD from the HSI CD in U.S. Government provided funds for the illegal transaction.

56. The next day, a MSP-CEU Detective provided a copy of the MA RMV ID application for the fraudulent identity used by the UCA.  BRIMAGE's employee number is listed as the RMV clerk issuing the MA ID under the UCA's identity and conducting corresponding actions, to include requesting a verification of the Social Security number and scanning the fraudulent identity documents into the RMV computer system.

## CONCLUSION

57. Based upon the foregoing facts, I believe there is probable cause to believe and do believe that Evelyn MEDINA, Annette GRACIA, Kimberly C. JORDAN, and David BRIMAGE, a/k/a David Brimage, Jr., during and in relation to any felony violation enumerated in subsection (c) of 18 U.S.C. § 1028A, to wit: section 911 relating to false impersonation of citizenship, knowingly transferred and possessed, without lawful authority, a means of identification of another person in violation of 18 U.S.C. § 1028A.

_____
Anthony P. Russo, Jr.
Special Agent
Homeland Security Investigations


Sworn to and subscribed before me this 24th day of July, 2017.



_____
        HON. DONALD L. CABELL
UNITED STATES MAGISTRATE JUDGE

